IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 1:24-CR-29 |
| MEHDI PAZOUKI, | Hon. Claude M. Hilton |
| *Defendant.* | Sentencing: May 24, 2024 |

**UNITED STATES' POSITION WITH RESPECT TO SENTENCING**

Defendant Mehdi Pazouki fraudulently obtained $455,166.33 in government-backed loans intended for businesses affected by the COVID-19 pandemic. The defendant obtained these loans on the false promise that he intended to use the funds for business-related expenses and working capital, when in reality he intended to, and did, use the money to pay off his personal debt, invest in real estate, and gamble.

The defendant has pleaded guilty to a single-count Information charging him with wire fraud, in violation of 18 U.S.C. § 1343. As calculated in the Presentence Investigation Report ("PSR"), the defendant's advisory Guidelines range is 15 to 18 months' imprisonment based on a criminal history category I and a total offense level of 14, including a 12-level increase under USSG § 2B1.1(b)(1)(G). *See* Docket Entry ("DE") 11. Pursuant to the Plea Agreement (DE 6), the government and the defendant have agreed to recommend to the Court that USSG § 2B1.1(b)(1)(E) should apply, resulting in an 8-level increase of the base offense level for a total offense level of 11 and a Guidelines range of 8 to 14 months' imprisonment. *See* PSR at 23. For the reasons that follow, the United States respectfully requests that the Court sentence the defendant to 12 months and 1 day in prison, a sentence that is within the Guidelines range recommended by the parties, impose a term of supervised release, order restitution in the amount

of $455,166.33, and enter the consent forfeiture order.[1] Such a sentence would be sufficient but not greater than necessary to accomplish Section 3553(a)'s sentencing objectives.

## BACKGROUND

### I. Factual Background

The defendant came to the United States from Iran at the age of 17 to further his education and became a United States citizen at the age of 30. PSR ⁋ 77. The defendant attended multiple universities in the United States, ultimately earning his Bachelor of Science degree in Computer Information Systems from Strayer College in Arlington, Virginia in 1989. *Id*. at ⁋⁋ 91-92.

Starting in October 2013, the defendant owned and operated Systems Integration Services, Inc. ("SIS"), an IT consulting company that he ran from his residence in McLean, Virginia. PSR ⁋⁋ 20, 94. The defendant was the sole employee of SIS and earned between $100,000 and more than $200,000 annually between 2018 and 2022. *Id*. at 95.

In response to the economic crisis caused by the coronavirus pandemic, the United States passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") in March 2020. Under this law, the Small Business Administration (SBA) made government-guaranteed loans available to qualified small businesses through the Economic Injury Disaster Loan ("EIDL") program. PSR ⁋ 23. The purpose of EIDLs was to enable small businesses to meet financial obligations and operating expenses in light of the pandemic. *Id.* To qualify for an EIDL, an applicant had to meet certain criteria, including, among other things, that it was in operation prior to the pandemic, and had regular operating expenses, which the applicant would have paid if not

[1] A consent forfeiture order and restitution order have been provided to defense counsel. The government anticipates that these orders will be agreed and will be presented to the Court for entry at sentencing.

for the pandemic. *Id*. Moreover, the amount of the loan that could be approved under the EIDL program typically was a function of the applicant's working capital. *Id.* The proceeds of an EIDL could be used for working capital and normal operating expenses. *Id*.

The CARES Act also established the Paycheck Protection Program ("PPP"), which endeavored to lend money to certain businesses for the primary purpose of providing money to fund and maintain payroll and cover other eligible business expenses. PSR ⁋ 24. Under the terms of the PPP, all PPP loans were 100% guaranteed by the SBA. *Id*. Thus, if there was a default on the loan, the SBA would reimburse the lender for the remaining balance once certain conditions and requirements set forth in the SBA regulations have been satisfied. *Id*. Further, once the borrower's loan application was approved and the funds were disbursed, the SBA would pay the lender a processing fee of 1–5% based on the amount of the loan. *Id.*

In 2020 and 2021, the defendant applied for PPP and EIDL loans on behalf of SIS and fraudulently certified that the funds would be used for business-related expenses and working capital, while in reality, he intended to use the loan proceeds for personal expenses, including to fund his gambling at area casinos, pay off personal loans and credit card debt, and purchase real estate. PSR ⁋ 22. The defendant electronically signed the EIDL loan agreements using DocuSign, which caused an interstate wire from the defendant's residence in McLean to DocuSign servers located outside the Commonwealth of Virginia. PSR ⁋ 41.

### A. PAZOUKI used EIDL proceeds to pay off personal debt and to purchase real estate.

On December 5, 2020, the defendant signed an EIDL loan agreement on behalf of SIS, certifying that the funds would be used solely as working capital. PSR ⁋ 27. On December 10, 2020, the SBA disbursed $103,300.00—the first of two EIDLs the defendant received—to SIS's business account at PNC Bank. *Id*. At the time, the defendant had very little money in the SIS

business account and in his personal checking account. *Id.* As was his intent when he initially applied for the EIDL, he began to use the EIDL for personal expenses almost as soon as he received the disbursement.

On December 2, 2019, the defendant emailed a representative of Credit One Bank regarding his concern that past late payments had impacted his credit score and would affect his ability to get a loan. PSR ⁋ 28. On December 8, 2020—two days before his first EIDL disbursement—the defendant emailed a local realtor, telling him that the defendant would work on his credit score and reach out again in two to three months when his credit score was improved. *Id*. On December 11, 2020—the day after the defendant received his first EIDL disbursement for $103,000.00—he used approximately $16,755 of EIDL funds to pay off personal credit card debt at PNC Bank, JP Morgan Chase, Citibank, and Credit One. *Id.* Then on December 14, 2020, the defendant used $3,227.79 of EIDL funds to pay off the balance on a loan from Mariner Finance. *Id.*

On December 10, 2020, the defendant emailed the same local realtor and a mortgage lender telling them that he had paid all his creditors except for his auto loan. PSR ⁋ 29. Then, on July 1, 2021, the defendant applied, and was approved, for a $518,436.00 loan from Loan Depot for the purchase of a condominium in McLean, Virginia. *Id.* at 30. Under the section titled "Liabilities – Credit Cards, Other Debts, and Leases that You Owe" the defendant intentionally omitted his EIDL and only listed one PPP loan, despite having already received his PPP second draw. *Id.* The defendant closed on the condominium on July 1, 2021. *Id.*

On August 7, 2021, SIS's EIDL was increased from $103,300.00 to $413,600. PSR ⁋ 31. On August 12, 2021, the SBA deposited $310,200.00 into the SIS business account. *Id.* Consistent with his financial status at the time of his first EIDL disbursement, when he received

the second EIDL disbursement the defendant had very little money in the SIS business account and his personal checking account. *Id.* Then, on August 16, 2021, the defendant used the EIDL funds to make a $17,259.06 mortgage payment to Loan Depot for his new McLean condominium. *Id*. at 32.

On August 12, 2021, the same day he received the EIDL increase, the defendant opened a personal investment account at Charles Schwab. PSR ⁋ 33. On August 17, 2021, the defendant used $42,000 in EIDL proceeds to fund the investment account, which he later used to make equity trades. *Id*. In his application, the defendant falsely claimed that the source of the funding was his salary, wages, and savings, when really the personal investment account was funded by EIDL money. *Id*. On October 27, 2021, the defendant made a second investment of $37,500 in the Charles Schwab account, $32,517.67 of which was EIDL money. *Id*.

On December 15, 2021, the defendant purchased approximately 6 acres of land in Aldie, Virginia. PSR ⁋ 34. At closing, the defendant used $65,603.78 of EIDL funds for the down payment and closing costs for the property. *Id*.

**B. PAZOUKI used EIDL proceeds to gamble at Hollywood Casino.**

On August 8, 2020, the same day that the defendant applied for his first EIDL, he signed and submitted a notarized request to the West Virginia lottery to be removed from the voluntary self-exclusion list at Hollywood Casino in Charles Town, West Virginia. PSR ⁋ 35.

Beginning on December 10, 2020, the day he received his first EIDL disbursement, through December 28, 2020, the defendant visited Hollywood Casino six times and spent approximately $27,565 from EIDL proceeds. PSR ⁋ 36. For example, On December 17, 2020, the defendant withdrew $5,000 from the SIS business account and, on the same day, placed a $5,000 wager on an NFL game at Hollywood Casino. *Id*. Between December 18, 2020, and

December 19, 2020, the defendant withdrew $9,000 in two transactions from the SIS business account. *Id.* On the following day, the defendant placed a $9,000 wager on another NFL game at Hollywood Casino. *Id.* Between December 10, 2020 and January 26, 2021, the defendant lost $48,678.00 to Hollywood Casino and wagered another $108,150 to Hollywood Casino. *Id.* At least $33,478.00 of this money came from the defendant's EIDL. *Id.*

**C. PAZOUKI used PPP money to purchase real estate.**

On the PPP loan applications, the defendant falsely certified that all loan proceeds would be used only for business-related purposes as specified in the loan application, and falsely claimed that the purpose of the loan was for utilities and covered operations expenditures. PSR ⁋ 26. In reality, the defendant knew that he intended to use the funds for personal expenses such as money service business transactions, payment of personal credit card debt, and to purchase real estate. *Id.*

On or around February 14, 2021, the defendant filled out a "first draw" PPP loan application for SIS and submitted it online to Itria Ventures LLC (Itria Ventures), a financial services company. PSR ⁋ 37. On the application, the defendant listed 1 employee and a monthly payroll of $17,000.00 to obtain a PPP loan in the amount of $20,833.33. *Id.* For the purpose of the loan, the defendant checked the boxes for "Utilities" and "Covered Operations Expenditures." *Id.* The defendant certified that all loan proceeds would be used only for business-related purposes. *Id.* Itria Ventures approved SIS for a PPP loan and on March 2, 2021, Itria Ventures deposited $20,833.33 into SIS's business account at PNC Bank. *Id.*

On April 11, 2021, the defendant prepared and submitted a second round ("second draw") PPP loan application for SIS. PSR ⁋ 38. This loan was also for $20,833.33. *Id.* To qualify for the second draw, the defendant falsely certified that he had a 25% reduction in gross

receipts, when really the defendant knew that the pandemic had a negligible effect on his business. *Id*. For example, in 2019, SIS received approximately $189,512 from its contracts and in 2020, SIS received approximately $185,840 from its contracts. *Id*. On the second draw loan application, the defendant listed gross receipts of $116,991 in 2019 and $78,714 in 2020. *Id*. Furthermore, for the purpose of the second draw, the defendant checked the boxes for "Utilities" and "Covered Operations Expenditures" and certified that all loan proceeds would be used only for business-related purposes. *Id*.

On April 13, 2021, Itria Ventures deposited the $20,833.00 into the SIS business account. PSR ⁋ 39. On April 23, 2021, the defendant made an offer to purchase the aforementioned condominium in McLean. *Id.* at 40. The defendant needed $5,000 for a deposit. *Id*. At the time the defendant made the offer, he had $3,002.17 in his personal checking account. *Id*. On April 26, 2021, the day after the defendant's offer was accepted, he transferred $5,000 from SIS's business account to his personal checking account and then provided a check in the same amount to the closing and title company. *Id*. When he closed on the condominium on July 1, 2021, the defendant used at least $4,500 in PPP money for the down payment. *Id*.

**D. Loan Forgiveness Fraud**

On July 21, 2021 and August 29, 2021, the defendant submitted applications for loan forgiveness for the March 2021 and April 2021 PPP loans described above. PSR ⁋ 44. The defendant drafted the forgiveness applications and each time falsely certified that the PPP money had been used either solely for payroll or for authorized purposes such as payroll, rent and utilities. *Id.* Relying on these false representations and false certifications, the SBA forgave the defendant's first and second draw PPP loans. *Id.* at 45. Those loans, therefore, did not have to be paid back by the defendant. *Id.* The forgiven loans totaled $41,666.33. *Id.*

In sum, the defendant's scheme to defraud caused Itria Ventures to disburse a total of $41,666.33 in PPP loans, and the SBA to part with $413,500 in EIDL loans, for a total actual loss of $455,166.33. PSR ⁋ 46.

**II. Procedural History**

On February 23, 2024, the defendant waived indictment and pleaded guilty to a single-count Information charging him with wire fraud, in violation of 18 U.S.C. § 1343. DE 3, 6. The defendant was released on bond pending his sentencing. DE 8.

## SENTENCING ANALYSIS

**A. Sentencing Guidelines Calculation**

To determine an appropriate sentence, "[a] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Next, "the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *Id*. Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a).

Although the guidelines are advisory and are only one of the factors listed in § 3553(a), they assist the Court by "provid[ing] certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities." *United States v. Booker*, 543 U.S. 200, 264 (2005) (internal quotation marks and citations omitted). Indeed, in the ordinary case, there will be a significant amount of overlap between the guidelines range and the remaining § 3553(a) factors, because the guidelines "reflect a rough approximation that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007). Thus,

although the guidelines are not mandatory, they remain "the starting point and the initial benchmark" in ensuring fair and just sentencing both for defendants, individually, and across multiple cases, collectively. *Gall v. United States*, 552 U.S. 38, 49 (2007). Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260-61.

Here, it is the government's position, in accordance with the Plea Agreement, that the total offense level for the defendant under the Guidelines is as follows:

| **Guideline** | |
|---|---|
| Base offense level for a violation of 18 U.S.C. § 1343. (USSG § 2B1.1(a)(1)) | 7 |
| The value of loss was greater than $95,000, but less than $250,000. (USSG § 2B1.1(b)(1)(E)) | +8 |
| The defendant has clearly demonstrated acceptance of responsibility for the offense. (USSG § 3E1.1(a)) | -2 |
| The defendant meets the criteria at USSG §§ 4C1.1(a)(1)-(10). Therefore, the defendant is a Zero-Point Offender. | -2 |
| **TOTAL OFFENSE LEVEL** | **11** |

The defendant's Criminal History Category is correctly calculated as I. PSR ⁋ 70. Therefore, based on a total offense level of 11 and a Criminal History Category I, the defendant's Guidelines range is 8 to 14 months' imprisonment.[2]

**B. The Defendant's Objections to the PSR**

The defendant objected to application of USSG § 2B1.1(b)(1)(G) for loss that exceeded $250,000. *See* PSR Addendum. As noted above, in accordance with the Plea Agreement reached by the parties, the United States recommends that the Court apply USSG §

[2] As previously noted, if the Court accepts the total offense level as it is calculated in the PSR, the defendant's Guidelines range is 15 to 21 months. PSR ⁋ 101.

2B1.1(b)(1)(E) in calculation of the applicable Guidelines range. In making this recommendation, the government does not adopt the defendant's legal reasoning as outlined in the Addendum.

**C. Section 3553(a) Factors**

Based on the circumstances of this case and a careful review of the § 3553 factors, the United States recommends that the Court: (1) sentence the defendant to 12 months and 1 day in prison; (2) impose a term of supervised release; (3) order restitution in the amount of $455,166.33; and (4) enter the consent forfeiture order. Such a sentence would be sufficient but not greater than necessary to accomplish Section 3553(a)'s sentencing objectives.

1. *The recommended sentence is necessary based on the nature, circumstances, and seriousness of the offense.*

The nature and circumstances of the defendant's offense are serious. The defendant took advantage of government relief programs meant to keep struggling businesses afloat in order to enrich himself and fund a gambling habit that he otherwise could not afford. When the defendant applied for these loans, he operated a business with very little overhead and which was largely unaffected by the COVID-19 pandemic. Despite these advantages, which set him apart from many struggling small businesses at the time, the defendant took money from relief programs to enhance his personal lifestyle. He wanted to buy real estate, get out of his personal debt, and gamble; he saw the pandemic relief loans as a means to do that. In addition, after he spent the PPP money on personal expenditures, he successfully applied to have the loans forgiven, thereby avoiding the need to ever pay them back. The defendant's intentional, fraudulent conduct calls for a sentence within the guidelines.

2. *The recommended sentence is necessary based on Defendant's personal history and characteristics.*

The defendant's personal history also supports the recommended sentence. The defendant earned a college degree and established a successful business. Through his business, he earned a substantial income. Yet, despite his many advantages in life and business, the defendant chose, more than once, to defraud the government.

3. *The recommended sentence is necessary to promote respect for the law and afford adequate deterrence of fraudulent conduct.*

The recommended period of incarceration promotes respect for the law and punishes the defendant's intentional conduct. It also provides general deterrence to others who would take advantage of government relief programs intended to ease the burden stemming from disasters like the COVID-19 pandemic.

4. *The recommended sentence is necessary to avoid unwarranted sentencing disparities.*

The recommended sentence would also prevent unwarranted sentencing disparities. The Court should give meaningful weight to the Guidelines range, which "represent[s] the collective determination of three governmental bodies—Congress, the Judiciary, and the Sentencing Commission—as to the appropriate punishments for a wide range of criminal conduct." *United States v. Cooper*, 437 F.3d 324, 331 n.10 (3d Cir. 2006) (quotation omitted); *accord Rita v. United States*, 551 U.S. 338, 346-47 (2007) (noting that an appellate presumption of reasonableness of a guidelines sentence is permissible, and that many sentences that fall within the guidelines will be reasonable, although sentencing court must reach independent determination). Given the facts of this case, the United States believes a sentence of 12 months and 1 day, which is within the Guidelines range recommended by the parties, is appropriate.

## CONCLUSION

For the reasons stated above, the United States respectfully recommends the Court: (1) sentence the defendant to 12 months and 1 day in prison; (2) impose a term of supervised release; (3) order restitution in the amount of $455,166.33; and (4) enter the consent forfeiture order. Such a sentence would be sufficient but not greater than necessary to accomplish Section 3553(a)'s sentencing objectives.

Respectfully submitted,

JESSICA D. ABER
United States Attorney

May 17, 2024

By: /s/

Lauren Halper
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Lauren.Halper@usdoj.gov