IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MEHDI PAZOUKI,<br><br>*Defendant*. | Case No. 1:24-cr-00029-CMH-1 |

**MEHDI PAZOUKI'S POSITION ON SENTENCING**

Mehdi Pazouki stands before the court for sentencing as a 65-year-old first time felon with no criminal history. As the Court is aware, Mr. Pazouki entered a guilty plea to one count of wire fraud in violation of 18 U.S.C. § 1343 for misusing the proceeds of two Paycheck Protection Program loans and one Emergency Injury Disaster Loan. As expressed in his letter to the Court,[1] Mr. Pazouki accepts full responsibility and is deeply remorseful for his criminal conduct. For purposes of sentencing under 18 U.S.C. § 3553(a), however, this crime must be viewed within the larger context of Mr. Pazouki's otherwise law-abiding and honest life. The positive impact Mr. Pazouki has had on those around him is clear when you review the many letters that friends and former colleagues have written to the Court. Further, since his father's passing in 2021, Mr. Pazouki has appropriately assumed the responsibility of caring for his elderly mother, who lives with him in his two-bedroom condominium.

Mr. Pazouki's serious, but anomalous, offense is largely the result of his decades-long struggle with a gambling addiction. To be clear, Mr. Pazouki does not raise his gambling addiction as an excuse for his crime. It is not one. However, it does provide context to the nature and

1 Mr. Pazouki's letter to the Court is attached as Attachment 1.

circumstances of Mr. Pazouki's crime and the reasons why Mr. Pazouki misused loan proceeds. Mr. Pazouki has always been gainfully employed, but his addiction has consistently led him to gamble away any discretionary income and prevented him from ever accumulating any level of material savings.

At the onset of COVID, the Small Business Administration ("SBA") began encouraging small businesses to apply for Paycheck Protection Program ("PPP") loans and Emergency Injury Disaster Loans ("EIDL"). Mr. Pazouki has a small IT consulting business, and he applied for two PPP loans and an EIDL loan for his business. Mr. Pazouki did not submit false information in any of his loan applications. But he has admitted to misusing the proceeds of these loans, largely for gambling and paying off existing liabilities related to his gambling addiction.

Fortunately, Mr. Pazouki has been able to seek and find treatment for his gambling addiction. In September 2023, Mr. Pazouki enrolled in counseling and therapy. With the exception of two minor relapses, he has successfully abstained from gambling since beginning his treatment. Mr. Pazouki has also enrolled in Voluntary Exclusion Programs ("VEPs") in Maryland, West Virginia, and Virginia that will prevent him from even entering casinos in any of these states. In addition to therapy and his enrollment in VEPs, Mr. Pazouki is seeking financial planning counseling to help him better manage his finances. While the process is difficult, Mr. Pazouki's addiction counselor, Leticia Tartakovsky, notes that he is making great progress and is serious about abstaining from gambling and changing the course of his life.

Mr. Pazouki is deeply embarrassed and remorseful for his criminal conduct. The crime for which he will be sentenced stands in stark contrast to the law-abiding life he has lived up to this point. It is a sad irony that Mr. Pazouki committed fraud after dedicating his entire adult life to helping the federal government reduce waste and detect fraud through his IT consulting. As a result

of Mr. Pazouki's guilty plea, he lost his job as a federal contractor and will likely face debarment, preventing him from continuing to work in the field he has dedicated his entire adult life to.

Moving forward, Mr. Pazouki feels strongly about making amends and paying restitution. Although Mr. Pazouki is living paycheck to paycheck, as he has done for most of his adult life (due almost entirely to his gambling addiction), in the time since he entered his plea agreement and with the help of a close friend, Mr. Pazouki has found new employment that will utilize his skillset and provide an income. Mr. Pazouki is hopeful that his new employment and source of income will allow him to continue to abstain from gambling, support himself and his elderly mother, and pay restitution in this case.

Mr. Pazouki respectfully asks this Court to fashion a sentence that will account for both the serious nature of his crime and the impact that incarceration would have on Mr. Pazouki's health, the progress he has made towards combatting his gambling addiction, his ability to support his elderly mother, and his ability to work and earn income to make restitution. For the reasons set forth herein, we respectfully submit that a sentence of probation with a condition of home confinement is sufficient, but not greater than necessary, to achieve the purposes of federal sentencing in this case.

## I. THE BASELINE ADVISORY SENTENCING GUIDELINES RANGE

Mr. Pazouki and the Government have objected to the PSR's loss amount of more than $250,000, but less than $550,000. The parties, as part of the plea agreement, have stipulated to a lower loss of more than $95,000, but less than $150,000. The guidelines and emerging case law support the parties' stipulated loss amount.

The sentencing guidelines define "loss" as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, comment (n.3(A)). "Actual loss" is defined in the guideline application notes

as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1, comment (n.3(A)(i)). Further, "intended loss" is defined in the guidelines as "pecuniary harm that was intended to result from the offense." U.S.S.G. § 2B1.1, comment (n.3(A)(ii)).

Mr. Pazouki's case involves the misuse of the proceeds from two Paycheck Protection Program ("PPP") loans and one Emergency Injury Disaster Loan ("EIDL"). While the $41,667 from the two PPP loans was forgiven and represents "actual loss," EIDL loans are not forgivable. Therefore, to apply the PSR's higher loss amount based on the EIDL loan, the Court would have to find that Mr. Pazouki "reasonably fore[saw]" or "intended" any loss to the Government when he misused the EIDL proceeds. Because Mr. Pazouki was making full and timely payments on the $413,000 EIDL loan, consistent with the terms of his loan agreement, up until his guilty plea, and those payments began before he became aware of the Government's investigation, there is no basis for this Court to conclude that Mr. Pazouki intended any loss to the Government.

Further, while there is an argument that EIDL loans would be a "Government Benefit" pursuant to the commentary section of U.S.S.G. § 2B1.1, that special rule is not applicable to Mr. Pazouki's conduct. *See United States v. Harms*, 442 F.3d 367, 380 (5th Cir. 2006) ("[T]he amount of loss is the difference between the amount the defendant actually received and the amount he would have received absent the fraud."); *see also United States v. Tupone*, 442 F.3d 145, 154 (3d Cir. 2006) (reasoning that the loss derived from the defendant's fraudulent receipt of worker's compensation benefits was "the difference between the amount of benefits actually obtained . . . and the amount of the government intended him to receive during the relevant period"). Here, Mr. Pazouki did not provide any false information in his application for the EIDL loan, as an EIDL applicant does not need to certify as to how they will use the EIDL proceeds, and he would have received the full $413,000 absent the misuse.

Finally, there is developing case law in other circuits that would limit loss for sentencing purposes to "actual loss."[2] These developments are based on the Supreme Court's decision in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), which restricted when a Court can permissibly give deference to U.S.S.G. commentary. Since that opinion, some circuits have found that loss under U.S.S.G. § 2B1.1 is limited to "actual loss" because the term "loss" is not ambiguous. *See, e.g., United States v. Banks*, 55 F.4th 246, 258 (3d Cir. 2022) ("Because the commentary expands the definition of 'loss' by explaining that 'loss is the greater of actual or intended loss,' we accord the commentary no weight. Banks is thus entitled to be resented without the 12-point intended-loss enhancement in § 2B1.1"). The U.S.S.G. commentary that provides the "Government Benefit" special rule would similarly expand loss beyond its unambiguous definition and the Court should not give it any deference.

To be clear, it was inappropriate for Mr. Pazouki to misuse the EIDL proceeds, and he has agreed to repay the full EIDL amount in restitution. However, restitution and loss are different. The EIDL loan, which Mr. Pazouki was making full and timely payments on, consistent with the terms of the loan agreement, through the date of his plea hearing, does not constitute loss to the Government for sentencing purposes.

---

2 The Fourth Circuit has not weighed in on this developing issue. In an unreported case, *United States v. Limbaugh*, No. 21-4449, 2023 WL 119577 (4th Cir. Jan. 6, 2023), the Fourth Circuit said that it was not clear error for the sentencing court to apply intended loss when there was no objection at the time of sentencing because "this is a new and fast-developing area of law, and as of now, we do not have the kind of robust consensus in other circuits that would allow us to label as 'plain' any error." The Fourth Circuit went on to say, "To be clear, we take no position on the underlying merits of [defendant's] claims, and it may be that these three cases represent the beginning of what will become a consensus view that at least some of the commentary to § 2B1.1 'sweeps more broadly than the plain text of the Guideline.'" *Id.* (quoting *United States v. Kirschner*, 955 F.3d 327, 333 (3d Cir. 2021)).

Using the parties' agreed upon loss, Mr. Pazouki has an Offense Level of 11 and a Criminal History Category of I, which together result in an advisory Sentencing Guidelines range of 8 to 14 months of incarceration. Given Mr. Pazouki's offense level and criminal history category, a term of probation with some condition of home detention is expressly appropriate. *See* U.S.S.G. § 5B1.1 ("[A] sentence of probation is authorized if . . . the applicable guideline range is in Zone B of the Sentencing Table and the court imposes a condition or combination of conditions requiring intermittent confinement, community confinement, or home detention.").

However, calculating the baseline advisory Guidelines range is only the first step in the federal sentencing process. *See Gall v. United States*, 552 U.S. 38 (2007). After calculating the baseline Guidelines range, the Court must determine whether to apply any Guidelines-based departures to adjust the applicable Guidelines range. *Id*. Once the final advisory Guidelines range is determined, the Court then must consider the factors set forth in 18 U.S.C. § 3553(a) and decide whether the circumstances and features of the case and the defendant before it warrant a variance from the Guidelines. *Id*. As set forth below, these factors further support a sentence of probation with some condition of home confinement.

## II. 18 U.S.C. § 3553(a) FACTORS

In the post-*Booker* era, the sentencing court's duty is to consider all of the factors identified in 18 U.S.C. § 3553(a) and "impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in the statute. Pursuant to the statute, the sentence imposed must: (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (2) afford adequate deterrence to criminal conduct; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). In addition, § 3553(a)

requires the sentencing court to consider the following factors (in addition to the advisory Guidelines range and any pertinent policy statements issued by the Sentencing Commission) in imposing a sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to victim(s). 18 U.S.C. § 3553(a)(1)-(7). These statutory factors further support the requested sentence.

### A. The Nature And Circumstances Of The Offense

The nature and circumstances of Mr. Pazouki's offense are largely addressed in the statement of facts included as part of the plea agreement and in the offense conduct portion of the PSR. Therefore, Mr. Pazouki only supplements the record with information regarding (i) why the fraud in this case is outside the heartland of COVID-relief-fraud cases and (ii) the role his gambling addiction played in the offense.

#### *i. This case is outside the heartland of COVID-relief-fraud cases*[3]

Mr. Pazouki's misuse is outside the heartland of COVID-relief-fraud cases, which typically involve the creation and submission of fraudulent records to the Government and defendants who never intend to repay the Government for the loan. Mr. Pazouki did not include any false information on his PPP and EIDL loan applications. Further, with respect to the EIDL loan, Mr. Pazouki always intended to fully repay the SBA consistent with the terms of the loan and took steps toward that goal. Mr. Pazouki had begun making payments toward his EIDL loan before he became aware of the Government's investigation, and he continued to make these payments until

3 We acknowledge that this distinction does not fully apply to the two smaller PPP loans because the SBA forgave those loans and, consequently, Mr. Pazouki was not making payments on the PPP loans.

his guilty plea earlier this year. While this does not excuse Mr. Pazouki's misuse of the loan proceeds, the nature of this crime is different from that of a defendant who creates and submits false records to the Government or steals money with no intent to repay it.

*ii. Mr. Pazouki's life-long struggle with gambling addiction*

As mentioned above, the nature and circumstances of Mr. Pazouki's offense cannot be fairly assessed without considering the context of Mr. Pazouki's lifelong struggle with gambling addiction. The serious consequences of Mr. Pazouki's addiction became apparent in the mid-1990s and early 2000s. Although Mr. Pazouki has always been gainfully employed, he would gamble away any discretionary income and has never had any material savings. Beginning in the mid-1990s, there were times when Mr. Pazouki gambled so heavily that he lost everything he had and needed to borrow money from close friends to cover basic living expenses, such as rent and utilities.

Mr. Pazouki's addiction grew even worse in the early 2000s when West Virginia legalized table game gambling and opened its own casinos. Before the West Virginia casinos opened, Mr. Pazouki would drive up to casinos in New Jersey every few weeks. However, the West Virginia casinos were significantly closer than New Jersey, and Mr. Pazouki found himself at a West Virginia casino every weekend.

Mr. Pazouki knew he had a problem with gambling in the early 1990s, but he did not know how to seek help. On January 12, 2014, after Mr. Pazouki had spent about two years gambling regularly in West Virginia, one of the dealers in a casino saw that Mr. Pazouki had a serious

gambling problem and told him about West Virginia's Voluntary Exclusion Program ("VEP").[4] Mr. Pazouki signed up for a one-year VEP the same day. Around the same time, Mr. Pazouki also signed up for a 2-year VEP in Maryland.

Unfortunately, the VEPs did not cure Mr. Pazouki's gambling addiction. He entered a vicious cycle of abstaining from and then relapsing into gambling. On January 16, 2015, as soon as Mr. Pazouki was eligible to be taken off the VEP, he asked West Virginia to remove him from the program and returned to gambling. Six months later, on July 26, 2015, Mr. Pazouki again signed up for West Virginia's one-year VEP. On August 11, 2019, Mr. Pazouki again signed up for the Maryland VEP.

When the SBA began inviting small businesses to apply for PPP and EIDL loans at the onset of the COVID-19 pandemic, Mr. Pazouki was in deep debt from his gambling addiction and was largely living paycheck to paycheck. Mr. Pazouki applied for two PPP loans and an EIDL loan for his IT consulting business. Mr. Pazouki did not submit false information in any of his applications, but he committed fraud by misusing the proceeds of these loans, largely through gambling with the loan proceeds and using the loan proceeds to pay off other existing liabilities related to his gambling addiction.

Mr. Pazouki's gambling addiction helps explain what drove an otherwise law-abiding and honest person to commit this offense. There has been significant research into gambling addiction and how it impairs an individual's ability to make rational decisions and leads otherwise law-abiding individuals to commit crime. In 1980, the American Psychiatric Association ("APA") first

4 The VEP is a way for people who have a gambling problem to voluntarily ban themselves from participating in any gambling activities in a state. Most states that have legalized gambling have also established VEPs with differing requirements to help problem gamblers abstain from the activity. When you sign up for a state's VEP, casinos in that state will not let you enter during your period of enrollment in the state's VEP.

recognized pathological gambling as a mental disorder, classifying it as an "impulse control disorder." More recently, in 2013, the APA reclassified gambling disorder as an addiction-related disorder based on significant research that pathological gambling and substance addiction affect similar areas of the brain in similar ways. An article on the topic states:

> Brain imaging and neurochemical tests have made a "pretty strong case that [gambling] activate the reward system in much the same way that a drug does." . . . . Gamblers report cravings and highs in response to their stimulus of choice . . . . Research has shown that problem casino gamblers show increases in heart rate and salivary stress hormones as well as blood levels of norepinephrine compared with non-problem gamblers. The former also show increases in dopamine, the key player in the brain's "reward circuit." [Moreover,] brain-imaging studies show that when exposed to gambling videos, problem gamblers' brains show "important similarities" to changes in the brains of cocaine addicts when viewing a video about cocaine.

C. Holden, *Behavior Addictions Debut in The Proposed Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-V)*, SCIENCE, February 2010 at 935; *see generally* Nat. Ctr. for Responsible Gambling, *Gambling and the Brain: Why Neuroscience Research is Vital to Gambling Research* (2011).

The DSM-V defines gambling disorder as "persistent and recurrent problematic gambling behavior leading to clinically significant impairment or distress." Among its characteristics are: (i) preoccupation with gambling; (ii) chasing one's losses (gambling more money on more risky bets in an effort to recoup losses); (iii) lying to conceal the extent of gambling; (iv) jeopardizing one's job or career opportunity; and (v) relying on others to provide money to relieve desperate financial situations caused by gambling. *Id*. The authors write:

> The essential feature of gambling disorder is persistent and recurrent maladaptive gambling behavior that disrupts personal, family, and/or vocational pursuits . . . . A pattern of "chasing one's losses" may develop, with an urgent need to keep gambling (often with the placing of larger bets or the taking of greater risks) to undo a loss or series of losses . . . . Although many gamblers may "chase" for short periods of time, it is the frequent, and often long-term, "chase" that is characteristic of gambling disorder . . . . ***Individuals may lie to family members, therapists, or others to conceal the extent of involvement with gambling; these instances of***

> ***deceit may also include, but are not limited to, covering up illegal behaviors such as forgery, fraud, theft, or embezzlement to obtain money with which to gamble . . . . Individuals may also engage in "bailout" behavior, turning to family or others for help with a desperate financial situation that was caused by gambling.***

*Id*. at 586 (emphasis added). Gambling patterns "may be regular or episodic and gambling disorder can be persistent or in remission," but it is typically a progressive disease. *Id*. at 587.

Gambling disorder involves multiple stages. The first stage, progression, is when the gambler is unable to stop gambling. He must spend more time and money gambling in an effort to achieve the same excitement. In the second phase, intolerance, the gambler starts to hide the amount and frequency of his losses, and experiences nearly uncontrollable urges to gamble to win back lost money. The third stage, preoccupation, is characterized by continuous obsessive thoughts of gambling and the belief that gambling will solve all problems. In the final stage, disregard for consequences, the gambler remains convinced that a "big win" will solve all problems, and disregards the negative consequences of his gambling, often engaging in illegal activities such as forgery, theft, and embezzlement. *See* Darren Gowen & Jerri B. Speyerer, *Compulsive Gambling and the Criminal Offender: A Treatment and Supervision Approach*, 59 Fed. Prob. 36, 36-37 (Sept. 1995).[5]

---

5 Studies find a high correlation between severe pathological gambling (8 to 10 DSM-IV symptoms) and illegal activity. *See* M. Toce-Gerstein, et al., *A Hierarchy of Gambling Disorder in the Community*, 98 Addiction 9661 (2003) (more than 60 percent correlation); *see also* M. Potenza, et al., *Illegal Behaviors in Problem Gambling: Analysis of Data from a Gambling Helpline*, 28 J. Am. Acad. Psychiatry & L. 389 (2000) ("these findings suggest that the gamblers with [illegal conduct] constitute a subgroup with more severe gambling-related pathology"). In the DSM-IV, there was a separate diagnostic criterion for "has committed illegal acts such as forgery, fraud, theft or embezzlement to finance gambling." DSM-V removed the criterion because it "appear[ed] to add little to diagnostic accuracy." N. Petry el al., *Changes Proposed for Pathological Gambling in DSM-5*, 3 (2014). That committing illegal acts is no longer a stand-alone diagnostic criterion does not alter the fact that illegal acts are highly correlated with "the most severe form" of the disorder. *Id*. "[S]tealing reflects the desperation that can occur in the context of this disorder." *Id*.

Prior to November 1, 2003, several courts found that "a pathological gambling disorder, if proven . . . to have resulted in a significantly reduced mental capacity contributing to the commission of the offense of conviction, [could] qualify . . . as a form of 'diminished capacity' under §5K2.13," and warrant a downward departure. *United States v. Harris,* 1994 WL 683429, at *4 (S.D.N.Y. Dec. 6, 1994) (collecting cases). For example, in *United States v. Liu,* 267 F. Supp. 2d 371, 375 (E.D.N.Y. 2003), the Court granted a 4-level downward departure, "leading to imposition of the minimum sentence permitted," based on the defendant's pathological gambling addiction, which "interfered with [his] ability to control behavior that he knew was wrongful." In *United States v. Checoura*, 176 F. Supp. 2d 310, 314 (D.N.J. 2001), the Court granted a downward departure to a compulsive gambler and noted that the defendant "did not choose to gamble compulsively, any more than other compulsives choose . . . to wash their hands after touching every doorknob."

In late 2003, without explanation, the Sentencing Commission issued a policy statement that "[a]ddiction to gambling is not a reason for a downward departure." U.S.S.G. § 5H1.4. The policy statement was a response to the PROTECT Act, in which Congress directed the Commission "to ensure that the incidence of downward departures [was] substantially reduced." Appendix C, amendment 651. The Act was widely criticized for "shuck[ing] the wisdom . . . and breadth of experience accumulated by judges" in fashioning individualized sentences. *United States v. Mellert*, 2003 WL 22025007, at *2 (N.D. Cal. July 30, 2003); see also J. Martin, Jr., *Let Judges Do Their Jobs*, N.Y. TIMES, June 24, 2003, (describing the Act as "completely at odds with the sentencing philosophy that has been a hallmark of the American system of justice").

After *Booker*, § 5H1.4's policy statement is not binding on a sentencing judge. *See United States v. Jones,* 460 F.3d 191, 194 (2d Cir. 2006) ("the Guidelines limitations on the use of factors

to permit departures are no more binding on sentencing judges than the calculated Guidelines ranges themselves"); K. Stith, *The Arc of the Pendulum: Judges, Prosecutors and the Exercise of Discretion*, 117 Yale L.J. 1420, 1482-83 (2008) (*Booker* "transmuted from 'law' to 'advice' all of the departure-reducing Guidelines amendments that the Sentencing Commission had promulgated pursuant to the [PROTECT Act]"). Section 5H1.4 is especially unworthy of deference because it was not the product of expert consideration. *See Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (where the Commission "did not take account of 'empirical data and national experience,'" the Guidelines should command little respect).

Further, post-*Booker*, Courts have continued to grant downward variances from the guidelines range based on a defendant's diminished capacity as a result of a gambling addiction. In *United States v. Dikiara*, 50 F. Supp. 3d 1029 (E.D. Wis. 2014), the defendant embezzled more than $1 million from her employer and "gambled away virtually all of the proceeds of her crime at [a] casino." *Id.* at 1030. The defendant's guideline range called for a sentence of 41 to 51 months. Before imposing a lesser sentence of 15 months, the Court noted: "By physically hijacking the brain, addiction diminishes the addict's capacity to evaluate and control his or her behaviors. Rather than rationally assessing the cost of their actions, addicts are prone to act impulsively, without accurately weighing future consequences." *Id.* at 1032 (quoting *United States v. Hendrickson*, No. CR 13-4110, 2014 WL 2600090, at *5 (N.D. Iowa June 11, 2024)). The Court further explained that the "[d]efendant did not act out of a desire to harm her employer, nor did she steal in order to finance a lavish lifestyle. Virtually all of the money went to the casino. The records from the casino demonstrated substantial losses, which ate up not just the proceeds of the crime but also defendant and her husband's savings." *Id.*

In *United States v. Caspersen*, 16-CR-00414 (S.D.N.Y. 2016), the defendant defrauded friends and families of more than $38 million to feed a gambling addiction. The sentencing guidelines called for 151 to 188 months of incarceration. Before imposing a lesser sentence of four years, Judge Rakoff commented that the defendant's gambling disorder "diminished his ability to make rational decisions." *Id*. ECF 37 (sentencing transcript), at 45. Judge Rakoff went on to explain that "[a]mong the most fundamental programs of our legal system . . . are that we distinguish between people who commit crimes because they have made a rational choice that they would rather do something antisocial and harmful to others in order to gain their material benefits . . . and those who act with diminished capacity and who are to some degree not acting with a full deck." *Id*. at 46-47.

In addition to these cases, some Courts and state legislatures have begun to establish special programs that recognize the diminished capacity of those suffering from a gambling disorder. In 2018, Nevada established its Gambling Treatment Diversion Court where non-violent offenders who commit crimes in "furtherance of a gambling addiction" can resolve their cases through diversion. *See* Judge Cheryl Moss, *Meet Your GTDC Team: Nevada's First Gambling Treatment Diversion Court* (Nov. 30, 2018), available at https://nvbar.org/meet-your-gtdc-team-nevadas-first-gambling-treatment-diversion-court/. Ohio and New Jersey are currently considering their own diversion programs for non-violent offenders who commit crime because of a gambling disorder. *See* Mike Seely, *Ohio Explores Diversion Court For Problem Gamblers Who Commit Crimes*, OH BETS (Mar. 2, 2022), available at https://www.ohbets.com/ohio-explores-diversion-court-problem-gamblers/. In pushing for the New Jersey program, New Jersey Assembly members Caputo, Benson, and Verrelli issued the following joint statement:

> ***We should be helping those with gambling addictions who have committed minor offenses, not imprisoning them.*** With the three locations throughout the State, we

> will be able to provide services for everyone referred to the Gambling Treatment Diversion Court Pilot Program.
>
> Often, gambling addictions cause emotional and financial strain on families who simply want to help. These personal issues are often difficult for many to discuss with loved ones and can go ignored. This bill will give those in need an important resource to help overcome their tribulations.
>
> ***Other states such as Nevada have used similar programs and have seen great success. It is time New Jersey adopted similar established practices to help residents and families dealing with a gambling addiction.***

*Caputo, Benson, & Verrelli Introduce Measure to Help Residents Combat Gambling Addictions,* available at https://www.assemblydems.com/caputo-benson-verrelli-introduce-measure-to-help-residents-combat-gambling-addictions/ (emphasis added).

Again, this is not to say that Mr. Pazouki's gambling addiction excuses the crime he committed. It does not. However, as these courts and legislatures have recognized, a defendant like Mr. Pazouki who succumbs to an addiction and commits a criminal act in furtherance of that addiction does not act with "a full stack" and is less culpable than defendants who are able to rationally weigh the consequences of their actions and nevertheless choose to commit a crime. Mr. Pazouki's diminished capacity supports a sentence of probation with a condition of home confinement.[6] Such a sentence would also allow Mr. Pazouki to continue his treatment for gambling addiction with his current gambling addiction counselor, Ms. Tartakovsky. *See* U.S.C. § 3553(a)(2)(D) (requiring the Court to consider the defendant's need for "medical care, or other correctional treatment in the most effective manner").

### B. History And Characteristics Of The Defendant

Mr. Pazouki's personal history and characteristics support a sentence of probation with a condition of home confinement. Mr. Pazouki's law-abiding life and years of service to the federal

---

6 Mr. Pazouki's offense level and criminal history would permit a sentence of probation with a condition of home confinement even without a departure based on his diminished capacity.

government, the central role he plays in caring for his elderly mother, and his own age and health all support a sentence of probation with a condition of home confinement.

*i. Mr. Pazouki's law-abiding life and career in support of the federal government*

Other than the instant offense, Mr. Pazouki has lived a law-abiding and honest life. Of which, he has dedicated the last nearly three decades to serving the federal government as an IT consultant. Mr. Pazouki is extremely proud of his career and the opportunities he had to work for the United States government, but his life and career were not a foregone conclusion. He had to work hard and overcome obstacles to even obtain an education in the United States.

Mr. Pazouki came to the United States from Tehran, Iran at the age of 17 to study Computer Science at Boston University and to pursue the American dream. However, shortly after he arrived in the United States in 1980, the Iranian Revolution began. The revolution had a serious impact on Mr. Pazouki's parents and prevented them from continuing to financially support his education and living expenses. As a result, Mr. Pazouki transferred to San Bernardino Community College, where tuition was more affordable and where he could rely on a family friend to support his living expenses. Less than a year later, Mr. Pazouki withdrew from San Bernardino Community College and moved to Washington, D.C. and then Maryland. Mr. Pazouki worked as a line cook to support himself while attending classes at a variety of D.C. area schools, including Montgomery College and the University of Maryland. Mr. Pazouki ultimately received a Bachelor of Science degree in Computer Information Systems from Strayer College.

After completing college, Mr. Pazouki had the opportunity to work as an IT subcontractor for a variety of government agencies, including Office of Management & Budget (OMB), Customs & Border Patrol (CBP), General Services Administration (GSA), U.S. Citizenship and Immigration Services (USCIS), Department of Housing and Urban Development (HUD), Internal

Revenue Service (IRS), Department of Labor (DOL), National Oceanic and Atmospheric Administration (NOAA), the National Institutes of Health (NIH), and most recently the U.S. Census Bureau (Census). Throughout his nearly 30-year IT career, Mr. Pazouki worked primarily on projects to help reduce costs for the federal government and to create processes to detect fraud.

Mr. Pazouki's work ethic, integrity, and law-abiding character are clearly reflected in the letters written to the Court by individuals who know him best, all of which are consolidated as Attachment 2.[7] Daniel Griffith Drew, Jr., Mr. Pazouki's former supervisor from when he worked for the U.S. Census Bureau, writes:

> One of the qualities that stands out most about Mr. Pazouki is his unwavering honesty and integrity. He is a person of impeccable character, and his integrity is reflected in his actions and interactions with others. I have seen Mr. Pazouki handle challenging situations with grace and integrity, always maintaining his composure and upholding the highest ethical standards.
>
> Furthermore, Mr. Pazouki is known for his willingness to go above and beyond to support his colleagues and clients. He is a team player who is always willing to lend a helping hand and offer support whenever needed. His positive attitude and willingness to collaborate make him a valued member of our team, and he is well respected by both his peers and our clients at Census.
>
> In light of Mr. Pazouki's outstanding character and contributions, I respectfully request that you consider leniency in his case. While I am not privy to the details of his legal situation, I believe that Mr. Pazouki's positive attributes and contributions to our community warrant a fair and compassionate consideration of his circumstances. I do know that he has already lost employment and I am confident that he is genuinely remorseful for any mistakes he may have made and that he is committed to learning from this experience and moving forward in a positive direction.

Mike Eskandary, a close friend of over thirty years, writes:

> Mehdi Pazouki has a deep sense of understanding and sympathy for upheavals effecting others. His dedication to his work and willingness to assist others in financial difficulties, or family matters exemplify his selfless

7 We have included several excerpts of the letters in this sentencing memorandum. However, we encourage the Court to review the letters in their entirety.

> nature and helpful demeanor. **I know of a family in particular whom that they were in financial difficulties which Mr. Pazouki helped them generously to avoid getting evicted from their residence.**

L. Jeff Wynne, Mr. Pazouki's former boss, who hired Mr. Pazouki to multiple of the above roles, writes:

> I first met Mehdi when I was the Manager of Revenue Systems at MCI Corporation in 1995. I hired Mehdi as a software developer. From the first day he started work, Mehdi showed that he was highly trustworthy and dedicated to his job. . . He frequently volunteered to work extra hours to help my department meet its demanding objectives. . .
>
> A few years later, I was hired at Accenture as Sr. Manager in their telecom practice. In 1999, while supporting our client, Verizon, I served as Acting Director of Data Management. I hired Mehdi Pazouki as a Senior System Analyst to help me deliver on Verizon's very aggressive technical objectives. . . While on the Verizon project, Mehdi again demonstrated the highest levels of dedication, personal integrity, and a willingness to work long, unplanned hours to achieve our client's deliverables.
>
> Lastly, and once again, when one of my clients (this time it was the GSA – General Services Administration) required the services of a top technical resource, I hired Mehdi Pazouki! . . . He delivered a wide range of high-level IT consultative services with integrity, professionalism, and distinction. . .
>
> Although I do not know the details of his legal situation, I know Mehdi the good son, the loyal, dedicated, dependable co-worker, and the good friend. I humbly ask that you consider leniency.

Laura Machanic, another long-time friend of Mr. Pazouki writes:

> Given all of the above, I cannot understand this egregious and extremely unfortunate lapse in judgment by Mehdi that has landed him in your courtroom. I am angry at him and I am also sad for him, but those feelings don't change 30 years of knowing him. I can't explain it or understand it but I can share with you that he is a good man, a deeply caring man, a good member of his community, and a good friend. I believe he will repay his debts and make amends for what he has done.
>
> I therefore ask you, your Honor, with the utmost respect, to be lenient with Mehdi in your sentencing. He appears before you as one of many who cross your docket, another random person, but he is a man with a life and a family who will be deeply affected by his sentence. I believe Mehdi will atone for his wrongdoing and move forward to live an exemplary, honest life. I hope you will take this perspective into consideration as you weigh his options.

As these letters reflect, Mr. Pazouki is a fundamentally honest, caring, and hardworking person who has positively impacted those around him. The anomalous bad act reflected in his criminal plea, while serious, should not overshadow Mr. Pazouki's otherwise law-abiding and honest life as the Court considers the appropriate sentence to impose.

*ii. Mr. Pazouki's role as caretaker for his mother*

The Court should also consider the critical role Mr. Pazouki plays as caretaker for his 84-year-old mother, the most important person in his life. When Mr. Pazouki's father passed away in 2021, Mr. Pazouki appropriately assumed primary responsibility for caring for his mother. Although Mr. Pazouki has limited financial resources, Mr. Pazouki's elderly mother moved into his two-bedroom condominium. Mr. Pazouki handles his mother's daily medications, prepares her meals, and is responsible for taking her to medical appointments.

Section 5H1.6 of the Sentencing Guidelines (Policy Statement on "Family Ties and Responsibilities") recognizes the Court's discretion to grant a downward guidelines departure if the defendant's service of a sentence within the applicable guidelines range would cause a loss of essential caretaking or financial support to the defendant's family. The Court's focus should be on the "effect of the defendant's absence on [his] family members." *United States v. Schroeder*, 536 U.S. 746, 756 (7th Cir. 2008) (citing *United States v. Johnson*, 964 F.2d 124, 129 (2nd Cir. 1992) ("The rationale for a downward departure here is not that [the defendant's] family circumstances decrease her culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing.")).

Regarding the three non-exhaustive general considerations listed in Application Note 1(A) to the Policy Statement, including the "seriousness of the offense," we submit that while Mr. Pazouki's crime is serious, it is not serious to a degree that should preclude consideration of the

impact that his absence would have on essential caretaking within his family. The remaining two considerations are inapplicable, as Mr. Pazouki's mother was not involved in his offense and there was never any risk of danger to Mr. Pazouki's mother as a result of the offense.

As for those factors expressed in Application Note 1(B), we submit that a sentence of incarceration would "cause a substantial, direct, and specific loss of essential caretaking, or essential financial support" to Mr. Pazouki's mother. Mr. Pazouki physically, emotionally, and financially supports his mother. We respectfully submit that Mr. Pazouki's incarceration would wreak harm on his mother and that this impact should strongly be considered as a basis for imposing a non-custodial sentence.

*iii. Mr. Pazouki's age and health*

The Court should consider Mr. Pazouki's age and health in determining an appropriate sentence. Mr. Pazouki is currently 65 years old and had a serious heart attack four years ago, on February 1, 2020. Mr. Pazouki would have likely died from the heart attack if it had not been for a bystander physician who was able to resuscitate Mr. Pazouki. According to medical records, Mr. Pazouki had a "down time" of five minutes, during which he was not breathing. After Mr. Pazouki was transported to the hospital, medical professionals induced a 72-hour coma, intubated Mr. Pazouki, performed an "emergency left heart cardiac catheterization," and inserted several stents. To this day, Mr. Pazouki must attend regular appointments with his cardiologist and primary physician.

Additionally, the Court should consider both the increased cost of incarcerating an individual of Mr. Pazouki's age and health as well as the Bureau of Prisons' apparent inability to provide proper care to aging inmates. The Department of Justice itself has reported that aging

inmates (classified as age 50 or older) are substantially more costly to incarcerate than younger inmates:

> We found that this cost differential is driven by increased medical needs, including the cost of medication, for aging inmates. BOP institutions with the highest percentages of aging inmates in their population spent five times more per inmate on medical care ($10,114) than I institutions with the lowest percentage of aging inmates ($1,916). BOP institutions with the highest percentages of aging inmates also spent 14 times more per inmate on medication ($684) than institutions with the lowest percentage ($49).

*See* Department of Justice, Office of the Inspector General, *Report on the Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, at ii (May 2015).

In addition to its cost findings, the investigation also revealed that the BOP (1) does not have the appropriate level of staff to meet the needs of its aging population, (2) is not physically equipped to house elderly inmates, and (3) does not provide adequate programming opportunities for aging inmates. Moreover, the report concluded that aging inmates commit far less misconduct, have lower risks of recidivism and that, if not for BOP policy limitations, would be viable candidates for early release from prison. *See id*. at i-iii. The government will bear a higher cost and burden to incarcerate Mr. Pazouki, and it appears from the Department of Justice's report that the increased costs still will not necessarily ensure that Mr. Pazouki's needs will be met. *See* 18 U.S.C. § 3553(a)(2)(D) (requiring the Court to consider the defendant's need for "medical care . . . in the most effective manner").

Mr. Pazouki's law-abiding life and years of service to the federal government, the critical role he plays in caring for his elderly mother, and his own age and health all support a sentence of probation with a condition of home confinement.

### C. The Need For The Sentence Imposed To Reflect The Seriousness Of The Offense, To Promote Respect For The Law, And To Provide Just Punishment For The Offense

Mr. Pazouki acknowledges that he must suffer consequences for his criminal conduct, but this case is outside the heartland of PPP fraud cases. Mr. Pazouki did not fabricate financial records to boost the size of his loans. Nor did he make false representations on his EIDL application. A sentence of probation with a period of home confinement falls within the types of sentences that the sentencing guidelines deem appropriate for a Zone B offender, like Mr. Pazouki. Such a sentence is further supported by the mitigating circumstances of Mr. Pazouki's debilitating gambling addiction, the important role Mr. Pazouki plays in supporting his elderly mother, his own health conditions, and his need to work to continue to support his mother and make restitution to the Government. The requested sentence adequately reflects the seriousness of the offense, promotes respect for the law, and provides just punishment.

### D. Afford Adequate Deterrence To Criminal Conduct And Protect The Public From Future Crimes Of The Defendant

The public does not need any further protection from Mr. Pazouki, nor is there reason to believe he will reoffend. Mr. Pazouki's crime was motivated by his gambling addiction. Mr. Pazouki is now receiving the help he needs to combat his addiction and to change his life going forward. On September 26, 2023, Mr. Pazouki enrolled in therapy sessions with a gambling addiction counselor, Leticia Tartakovsky, in connection with the Virginia Partnership for Gaming and Health (VPGH). Ms. Tartakovsky wrote a letter to the Court describing Mr. Pazouki's progress, his desire to change, and the deep shame and remorse he feels for how his actions have impacted those most important to him:

> Since Mr. Pazouki started therapy, he has been showing great progress, refraining from gambling and is also attending peer recovery group. In his first session, he was diagnosed with moderate gambling disorder (F63.0), reporting several unsuccessful attempts to control, preoccupation with gambling, chasing losses, and

> lying about it. Additionally, client reported borrowing money to gamble, and that he had lied to hide the extension of his involvement in gambling. He lost important relationships due to his gambling problem, as well as financial losses. Additionally, he reported facing legal charges due to misusing federal money.
>
> As a client, he never missed a therapy session, and showed motivation to change, which resulted in a chance of behavior, meaning complete cessation of gambling. He is under a lot of stress due to his legal issues, but remains affirming that he no longer intends to gamble, due to all the problems and losses this addiction caused him. Client reports regret for his actions, feelings of shame and guilt, and in a clinical setting, was always very respectful and kind. In addition, Mr. Pazouki reports concerns for his elderly mother, who he takes care of, and how his case may impact her emotional wellbeing.
>
> Your honor at end, I plead with you for leniency for Mr. Pazouki.

Letter by Ms. Tartakovsky, attached as Attachment 3. Further, the supervisor of Mr. Pazouki's peer-based recovery group sessions writes that "Mr. Pazouki and has been a great asset to our recovery community providing strong male peer leadership to other participants. . . We are very proud of Mr. Pazouki and believe that he will continue to grow and increase his successes should he remain on the path to recovery as a participant in our program." Letter by Mr. Fournia, attached as Attachment 4. Mr. Pazouki's best chance at overcoming his gambling addiction is through his current treatment.

Mr. Pazouki also appears to be at low risk of reoffending based on available empirical evidence. According to the United States Sentencing Commission, a male Criminal History Category I offender over the age of 50, like Mr. Pazouki, has a historical general recidivism rate of 6.2%, which is the lowest reported recidivist rate in the Commission's study.[8]

Moreover, Mr. Pazouki has already faced serious consequences for his conduct. He lost his security clearance and employment. He will likely never be able to work for the federal

---

8 *See* U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 28 Ex. 9 (2004) (listing the recidivism rates for various types of offenders and considering demographics such as gender, age, race, drug use, marital status, etc.), available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf.

government again, work he was passionate about and a career he was proud of. Going forward, he will face all the stigma and consequences that accompany a felony conviction. His family, many of his close friends, and members of the community are aware of these charges, and he is still coping with how to interact with the community. Mr. Pazouki is deeply ashamed and embarrassed about his conduct and of the impact it has had on those he loves. These consequences provide sufficient specific deterrence.

Although general deterrence remains a required consideration under § 3553(a), there is little evidence to support a finding that harsh sentences deter future criminal conduct. The unique combination of motivation and circumstances that lead otherwise law-abiding citizens to risk prosecution and imprisonment are not so easily overcome by the simple imposition of lengthy sentences. While such a theory might be appealing on its face, the reality is that there is little to no difference in the deterrent effect between probation and imprisonment.[9] Indeed, available research

9 *See* Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 PRISON J. 48S, 50S-51S (2011) (according to "the best available evidence…prisons do not reduce recidivism more than noncustodial sanctions"); *see also* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) ("increases in severity of punishments do not yield significant (if any) marginal deterrent effects.").

suggests that the certainty of being caught and punished carries for greater deterrent effect than the severity of the punishment.[10]

In sum, a probationary sentence with a condition of home confinement provides sufficient specific and general deterrence.

### E. Policy Statements/Considerations

Congress's original directive to the Sentencing Commission to "ensure that the guidelines reflect the ***general appropriateness of imposing a sentence other than imprisonment*** in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense" supports a non-custodial sentence here. *See* 28 U.S.C. § 994(j) (emphasis added). Mr. Pazouki is a first-time offender, and this is not a crime of violence or an otherwise serious offense. As provided in the PSR, Mr. Pazouki meets the criteria of a Zero-Point Offender under U.S.S.G. §§ 4C1.1(a) and (b). A sentence other than imprisonment is appropriate here.

### F. The Need To Avoid Unwarranted Sentencing Disparity

A sentence of home confinement would not create unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. As an initial

10 *See* David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 CRIMINOLOGY 587 (1995); see also Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime, 8 CARDOZO J. CONFLICT RESOL. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); *see also* Symposium, U.S.S.C., Federal Sentencing Policy for Economic Crimes and New Technology Offenses, Plenary Session I, "What Social Science Can Contribute to Sentencing Policy for Economic Crimes," at 22 (Oct. 12, 2000) ("One consistent finding in the deterrent literature is that the certainty rather than the severity of punishment seems to be the most effective deterrent."), available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20001012-symposium/cPlenaryI.pdf.

matter, regarding the EIDL misuse portion of the case, there is incredibly little precedent of criminal charges against individuals for misusing EIDL loan proceeds, absent additional false information on their loan applications (which is not present here). However, even reviewing cases involving false information in the loan application itself, higher sentencing guidelines, and other aggravating factors, there is support for a home confinement sentence.

An analogous misuse case would be *United States v. McConnell*, 1:21-cr-00216-CCC (M.D. Penn. 2022). In that case, the defendant and her husband misused $244,292 from PPP loan proceeds for personal use, including spending $37,000 to purchase two vehicles and $195,300 towards purchasing a home. The defendant had an offense level of 13 (which provides a guideline range of 12 to 18 months). Nevertheless, the judge sentenced her to two years of probation. Likely relevant to the Judge's decision was the defendant's caretaking responsibility for her children.

Courts have also given probationary sentences in cases involving fraudulent applications and higher offense levels. In *United States v. Jenison*, 2:21-cr-00090-ALM (S.D. FL. 2021), the defendant submitted multiple PPP loan applications seeking $298,719. In support of these applications, the defendant created multiple false documents, including false bank account statements, false tax documentation, and corporation documentation with false dates. Subsequently, the defendant made additional false claims about federal employment tax deposits. Defendant's bank ultimately approved two of the applications and transferred $160,247. The defendant had an offense level of 16 (which provides a guideline range of 21 to 27 months) and the Government requested 21 months of incarceration, the low end of her guideline range. Nevertheless, the judge sentenced her to five years of probation, including six months of home confinement.

The above cases show that a sentence of probation including a period of home confinement would fall in line with sentences imposed on similar, if not more serious, offenders.

**G. The Need To Provide Restitution To Victims**

The need to provide restitution to victims in this case supports a non-custodial sentence. Mr. Pazouki currently does not have the ability to pay restitution. While Mr. Pazouki is living paycheck to paycheck, as he has been for most of his adult life, he feels strongly about making amends and paying restitution for his crime. Mr. Pazouki has already taken significant steps to make restitution in any way he can. Mr. Pazouki was able to sell a piece of land and make $52,000 in restitution prior to sentencing.[11] Mr. Pazouki has further agreed for the Government to place a lien on the condominium he shares with his elderly mother and understands that sometime in the future the Government will execute on that lien and force him to sell the property. Since his plea agreement, Mr. Pazouki has been able to find new employment, due to the help of a close friend and his valuable skillset. A non-custodial sentence will allow Mr. Pazouki to continue to make an income to pay restitution in this case, as well as support himself and his elderly mother.[12]

**CONCLUSION**

For the foregoing reasons and any other that may appear to the Court or that may develop at the sentencing hearing, Mr. Pazouki asks this Court to sentence him to a term of probation with a period of home confinement.

---

11 While Mr. Pazouki misappropriated some of the EIDL loan for the downpayment and closing costs to purchase this land, he also made significant mortgage payments over the last three years with his legitimate income. Nevertheless, Mr. Pazouki agreed to forfeit the full $52,000 from the sale.

12 A non-custodial sentence will further allow Mr. Pazouki to continue to make mortgage payments on his condominium, which increases the Government's recovery when it chooses to execute on the lien and force the sale of the property.

Respectfully submitted,

MEDHI PAZOUKI,
By Counsel

/s/ Noah Cherry
Noah Cherry (VA Bar # 95726)
SCHERTLER ONORATO MEAD & SEARS, LLP
555 13th Street, NW
Suite 500 West
Washington, DC 20004
Telephone: (202) 628-4199
Facsimile: (202) 628-4177
ncherry@schertlerlaw.com

*Counsel for Mehdi Pazouki*

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of May 2024, I electronically filed a true copy of the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all parties.

/s/ Noah Cherry
Noah Cherry (VA Bar # 95726)